Court is now in session. We have one appeal that is scheduled for argument this morning. Michael Hearn versus Comcast Cable Communications. Fredrick Shaw is here for the appellate Comcast. Daniel Zengel is here for the appellate Hearn. And Mr. Shaw, are you ready to proceed? Yes, Your Honor. May it please the court. Fredrick Shaw for appellate Comcast. The arbitration agreement between Comcast and plaintiff is clear. It requires arbitration of any dispute between the parties. As this court observed earlier this year in Cordova v. Direct TV, quoting circuit precedent, where an agreement evinces a clear intent to cover more than just those matters set forth in the contract, this court has upheld and enforced broad clauses requiring arbitration of all disputes between the parties, end quote. That said, the narrower path this court ultimately charted in Cordova provides an independent basis to compel arbitration here. This court reversed a denial of motion to compel arbitration under materially similar circumstances. Like here, the plaintiff in Cordova signed up for TV services pursuant to a subscriber agreement. Like here, the agreement included a clause requiring arbitration of any dispute between the parties. And like here, the plaintiff nevertheless sued on a federal statutory claim alleging the unauthorized sharing of personal information obtained pursuant to that agreement. This court compelled arbitration on the ground that Cordova's claim at least arose out of or related to his relationship with defendants. If not for plaintiff subscriber's relationship with defendant, this court wrote, quote, the factual allegations underlying his claim would be non-existent. Defendant would not have his information to share. End quote. Mr. Shaw, this is Judge Wilson. Why aren't we bound by our decision in telecom Italia versus wholesale telecom, which the district judge relied on in this case? The arbitration agreement has to arise out of or relate to the underlying agreement. Sure, your honor. Telecom Italia, I think makes our point. In that case, the arbitration agreement itself said that the claim has to arise out of or relate to the agreement. And in fact, telecom Italia is supportive because it goes on to say, if in fact the parties wanted a broader relationship, they would have used broader language. And that's what this court also said in Doe and Hemisphere. That's this case where it's undisputed. The arbitration here, agreement is here, is much broader than that in telecom Italia. It says you shall arbitrate any dispute. Now that would be the broad form of the theory. You apply the text and we win under that broad theory under this court's binding decision in Brown v. ITT. However, this court, Judge Wilson, if it prefers, can take the path that it took in the Cordoba v. DirecTV decision, which is to say, even if you read into, unlike in telecom Italia, you read into this arbitration agreement the same limiting principle that it has to arise out of or relate to the underlying agreement. Well, just like in Cordoba, that connection is present in Spade's here. And indeed, I think- Didn't Cordoba have the specific arising out of language though? Isn't that a pretty important distinction? Well, Your Honor, I guess a couple of things. In the frontline arbitration agreement in Cordoba was similar. It said all claims. And then it said including, and then it specified different things like including claims that arise out of the relationship. You have similar language here. It's any dispute. And then there is, it defines any dispute as any claim or controversy related to Comcast, including, and then it goes through a subset of claims. So, Your Honor, both agreements were very broad. The one in Cordoba and the one here, they were equally broad. And then the court in Cordoba took the narrower ground and says, we're gonna use one of those narrower including clauses. And since it satisfies that, we don't really have to go any further. The district- Does it matter here that there's a factual dispute about whether Comcast had the information or not? No, Your Honor. First of all, just to be clear, there is no factual dispute on the record as to whether Comcast actually possessed the personal information before. If you look at complaint paragraph 11, even though they allege that in their brief, it's nowhere in the record. Paragraph 11 of their complaint says, Comcast never even requested plaintiff's social security number to run the credit check, to run the pool. And then the declarations that were submitted at the motion to compel arbitration also support that. The Patel Declaration, that's 18.1 paragraph five, Comcast verified the information already on file. There is no statement in either the complaint or the declarations from either side that create any dispute that Comcast had this personal information. In fact, it's undisputed that it did. It had a prior subscriber relationship with the plaintiff. Part of that prior subscriber relationship, and in fact, it's in paragraph 15B of the agreement itself, says that the plaintiff has to give the personal information to Comcast. So Comcast had that personal information and then it verified that information. Now there are multiple touch points to the agreement here. It's not just the but for, although that's certainly true, that but for the agreement, this claim wouldn't have arisen because Comcast wouldn't have had the information just as was true in Cordova v. Direct TV. But the connections to the agreement go beyond that or even stronger than in Cordova. Here you have the provision that I just mentioned, sections 15B of the arbitration agreement, which requires personal information from the plaintiff to Comcast. There's section 14 of the agreement, which is a privacy notice, which governs the treatment of personable, identifiable information. And then there are other provisions such as section 2G and section 2H, which govern situations in which a customer calls back and tries to get Comcast service again. And in 2H is explicitly a credit inquiry provision, which says, quote, you authorize Comcast to make credit inquiries for reasonable business purposes. So at the very least, this claim, a FCRA claim for unauthorized, running an unauthorized credit check, at least relates to the prior subscriber relationship and agreement. The court can simply reverse on that ground, like it did on Cordova v. Direct TV. If the court wants to go further and reach the issue that this court decided in Brown, it can do that, which is to say, look, when an arbitration agreement says any dispute, it means any dispute. And what this court said in Brown, the plaintiff in Brown argued the arbitration clause was too broad, quote, because it exceeds the scope of section two of the FAA by addressing not just those claims arising out of the contract, but all claims between the parties. And this court in Brown rejected that argument. It said no. It did so. It said for the reasons above, we also find this argument unpersuasive. I wasn't able to see a lot of analysis, I'll say, that related specifically to section two. Where do you draw this section two analysis from the Brown opinion? Sure, Your Honor. To this statement that it exists. Sure, Your Honor. I'll agree with you. It is not explained at any length, but they specifically, and here's the quotation, it's on page 1222 of the Brown decision. Plaintiff argues that, quote, the arbitration clause was too broad because it exceeds the scope of section two by addressing not just those claims arising out of the contract, but all claims between the parties, end quote. And then it rejects that argument. And what Brown says is we're gonna enforce the arbitration clause as written. And that sentiment has been echoed by this court in Citigroup. And then in the Doe and Hemispherix cases, it drew a distinction between agreements that said, look, the parties specifically negotiated that the claim has to arise out of. But if they would have simply put a period after any dispute, you would have a different result. So again, Your Honor, that's the broader theory. You don't have to go all the way there like you did in Cordova v. DirecTV. You could decide it on the narrower ground that, look, there are a lot of touch points here between the claim and the agreement. It at least arises out of or relates to that prior subscriber agreement. That's enough to decide this case. But again, if you do decide to address the broader issue, I think this court's precedent points strongly in the direction, if not binding, that the FAA requires courts to apply an arbitration clause as written when it's clear here. This is pretty important. We're seeing, I think, a lot more of these, I guess some of the literature has called them infinite arbitration contracts. And so, you know, we don't have a lot of cases necessarily dealing with the broad language that we have today. What would you say if there isn't, let's say for purposes of argument, that we decide that applying this contract, applying an infinite clause to its fullest extent to the parade of horribles about the Comcast truck hitting someone's child and then they have to go to arbitration, right? Let's say that we found that that was invalid for any number of reasons. Does that excise the entire arbitration agreement or would you say, well, no, as applied here, I know that we're mixing doctrines here, but how does that work in this context? Your Honor, to use your terminology, it would be an as applied analysis. The Eighth Circuit has addressed this in the Parham decision which is cited both in our opening brief and the reply brief. And it's at page 878 of the Parham decision. And there they were presented with exactly the hypothetical that you posed is, that the plaintiff there said, oh, look, I can think of these far-fetched hypotheticals kind of analogous to the securities fraud claim here or the Comcast truck hitting a child here. And what the Eighth Circuit said is, look, we're not gonna go into far-fetched hypotheticals and facts. We apply the arbitration clause to the facts as presented in the claim before us and decide whether it can be validly applied to the facts before us. So here, again, I think there are so many touch points. It's amply connected to that prior subscriber agreement. We're well within even the normal arbitration clause, let alone this broader arbitration clause. So Your Honor, I don't think you need to resolve the extreme case, which again, Comcast has never raised this arbitration clause, has no intent of raising this arbitration clause to that sort of extreme case. And if that case did ever arise, Your Honor, well, then at that point, you could maybe invoke one of these other defenses. If there are no further questions, I'll reserve the time for rebuttal. Thank you, Mr. Shaw. Mr. Zimmel. You have to unmute your microphone. Thank you. May it please the court. My name is Daniel Zimmel. I'm here on behalf of Michael Hearn. I wanna start with short key facts. During the call in 2019, during a request for pricing, Comcast pulled Mr. Hearn's credit without his permission. Now, defendant here at Comcast, they used the information that he provided during the phone call. And Mr. Shaw just pointed to paragraph 11 of the complaint, which was that Comcast never requested plaintiff's social security number to run the poll. There's a very important fact, which is a social security number is not necessary to run a credit, as long as there are other personal identifiers, such as a name, address, and date of birth. The assumption that because they had a social security number previously, they were then able to pull the credit is nowhere in the complaint or in the evidence. There's no question Mr. Hearn terminated the contract back in 2017, as per the instructions under the contract. And the contract doesn't call for post-termination revival. That being said, the analysis begins with FAA and 9 U.S.C. section two. And the plain language of section two says, any arbitration needs to be limited to the contract or the underlying transaction. The authority to compel arbitration isn't unconditional, but courts are bound by the terms of the act. And the defendant's arbitration clause here is obviously well beyond that. And the defendant is in fact trying to impose arbitration well beyond what was intended by the contractor or stated in the contract. In Revit versus DirecTV, the Ninth Circuit specifically addressed 9 U.S.C. section two very recently. And it found that claims which are unrelated to the underlying contract or the underlying transaction are beyond the ability of the court to enforce arbitration under the FAA. The same position was addressed by the dissent in May versus DirecTV by the Fourth Circuit very recently. And in the Fourth Circuit case also, the 9 U.S.C. section two wasn't directly addressed until the dissent. And here in our case, there's no question that what is seeking to be invoked does not relate to the underlying agreement or the underlying transaction, which was terminated two years prior. So you say there's no question. I think on my reading, it's perhaps a little bit closer than it was in those DirecTV cases. What's your response to the point about service reinstatement provisions in the contract? The only point in the contract that references service reinstatement is upon suspension. And there's no question that the contract was terminated, not suspended. Suspended is for non-payment or failing to comply with the terms. But Mr. Hearn complied with all the terms and terminated the contract completely. Now, the court's role outside of the analysis under the FAA is to determine whether a valid agreement exists. And if so, whether the dispute is within the scope of the agreement. To determine whether a valid agreement exists, we have to apply Georgia contract law as the district court did below. And the Georgia Supreme Court has made clear that we look to the plain language of the agreement and we look to the subjective intent of the parties, or I'm sorry, it's an objective analysis. What would a reasonable consumer believe when they are entering into that agreement? The second component of Georgia law is if the interpretation will lead to an absurd result, the court should instead give it a reasonable construction. What are we to make of the fact that a reasonable consumer, what a reasonable consumer probably believes is I need to click this little checkbox before I can get my Comcast cable set up. That's correct. We all do that, but the clear intent of the parties here, when you look at the language, the language isn't clearly advising the consumer, assuming Mr. Hearn didn't just click because he wanted to use a service, but assuming he read it as we have to assume because he signed the contract. The contract is never clear that this will apply to future unrelated post-termination disputes. That would be required under Georgia law, but also be required under Cordova, which I'll get to shortly. Why doesn't all disputes mean all disputes in a way that I think Brown versus ITT might suggest it does? How do you differentiate this case from Brown? Okay, so in Brown, the claimant issue was an employment issue under Title VII. Everything arose under the employment transaction. This case, what is arising here in 2019 does not arise out of any 2017 or 2016 interaction with Comcast. And that's within the plain language of the FAA, which isn't just that it'd be subject to the underlying agreement of the transaction, which is what occurred in Brown versus ITT. What about- Do you think- Go ahead. No, go ahead. What about Board of Trustees of City of Delray Beach versus Citigroup, which appears to make  that an arbitration provision that required the parties to arbitrate any and all claims is not overly broad or vague? So we've got two 11th Circuit cases that support the argument that if the arbitration provision applies to any and all claims, that's enforceable and not overly broad. The language any and all claims is limited by the intent of the parties. That's part of the contract formation. If the consumer doesn't recognize any and all claims to be something that is going to be completely unrelated to the agreement or transaction, then the FAA can't compel the result of arbitration. In Doe, another 11th Circuit case, the language there specifically said any and all disputes as well. But in that case, we know only the semen-related claims were compelled while the common law claims were not. If it were to adopt the conclusion of Comcast, Doe would be wrongly decided because the common law claims would have to be compelled, even though, specifically, because the underlying agreement says any and all disputes. And then I wanna back up because the agreement in Doe specifically said relating to or in any way arising out of or connected with the crew agreement, these terms or services performed for the company. And in Doe, the court specifically found that this, you know, the assault of the person was not part of her employment, right? That seems like a pretty important difference. Yes. In Doe, it wasn't part of her employment, but it was a dispute between the parties, which is encompassed by any and all disputes. And that only came about by the fact that she was employed by the boat company, otherwise she wouldn't be on there. I think that's certainly an argument that Princess Cruise Line's made, but it's not one that this court seems to have accepted. Okay, so I think that the language in Doe is very broad in the any and all context. And despite that, under Doe, claims survive in litigation without being compelled. And I think that analysis does apply here, and our case is similar to those claims. In Doe, the status was really the triggering event to link it to the underlying agreement or transaction. Mr. Hearn's status as a former subscriber is not an essential element of any of his claims. That being said, I wanna get back to the reasonable intent at the time of contract. The Ninth Circuit in Revitch versus DirecTV specifically addressed that too. And focusing as well as Wexler versus AT&T and Boss versus New York Life Insurance, when we focus on the intent of the parties, it cannot be for a future post-termination unrelated conduct. The Seventh Circuit in Smith versus Steinkamp held the same thing, which is when a provision is untethered to a contract or an underlying transaction, it is likely to lead to absurd results. Frankly, this case is an absurd result because Mr. Hearn two years ago had an agreement, he's now subject to that agreement for something unrelated to that transaction. That doesn't seem fair. Do you think we're bound, do you think that we're bound by the language in the earlier case that said that section two doesn't provide a limitation on, and arising out of limitation on arbitration agreements? I don't think the Brown case really addressed that argument. It certainly was certainly raised by one of the parties there, but it didn't go into it. Instead, it couched that argument as another argument by counsel that Title VII does not fall within the FAA. That is not the argument we're working here. We're focused on the strict language of the act, which is clear. The court in Cordova is important. It doesn't change the landscape of 11th Circuit law. It doesn't change the case law under Doe, the immediately foreseeable test, or the Telecom Italia case, also establishing the immediately foreseeable test. Comcast is looking for this court to let go of the immediate foreseeable test for the but-for test, and that's not correct. Below, Cordova was focused on contract formation, and the lower court found that the contract wasn't formed because of the lack of intent of the parties to cover that type of dispute. The circuit reversed, saying the intent of the parties was to encompass that type of dispute as an active subscriber, and therefore there was no flaw in the contract formation. That's the extent of Cordova. In our case, and Cordova highlighted, we look to the clear intent of the parties. Nowhere within the arbitration provision of the agreement does it clearly provide to say an objective consumer would intend for the agreement to encompass any post-termination unrelated dispute. Mr. Zimmel, if this is a close case, which I think it is, why shouldn't we construe any doubts concerning the scope of the arbitrable issues in favor of arbitration, which the Supreme Court said we're required to do, taking into consideration the liberal federal policy favoring arbitration? Yes. The presumption of arbitrability only applies to the second factor in analyzing arbitration provision. The first one is the contract, and the second one is whether it's within the scope. Only if something is within the scope does that presumption apply. That was recently found again by the Ninth Circuit. It was also discussed in May, the Fourth Circuit case. Given that on the issues of contract formation, the presumption is inappropriate here. That's separate and apart from the argument that because this arbitration agreement is so much broader than 9 U.S.C. Section 2, that presumption doesn't apply given the breadth of the arbitration agreement either. The next question is whether the dispute at issue is outside the scope of the agreement. And as I've stated before, under Doe and telecom Italia, we've got this immediately foreseeable test. Was it immediately foreseeable in 2017 when Mr. Hearn terminated the agreement, or in 2016 when he signed the agreement that it would include claims unrelated post-termination years later? The district court felt it wasn't that way. And I think that's the appropriate result. In Cordova and in Doe, the 11th Circuit focused on the status of the plaintiff and whether that status was an essential element. In Doe, the status of being a seaman was an essential element of the maritime law claims. In Cordova, the essential element under the Steelaw claim was that the consumer is a current subscriber. In our case, that is just not present. Mr. Hearn and his credible does not require any proving that he was a prior subscriber of Comcast. And for that reason, the conduct here, temporally and substantively apart from what happened in 2017, is simply outside the scope. Does it make any difference whether they had all the information they needed at the time of his call or not? So first, so the district court below cited some current and 11th Circuit authorities saying that alone is not sufficient to compel arbitration. Whether they had the information before isn't really the triggering event for the credit poll. As I argued in my briefs, Mr. Hearn provided the necessary information in 2019. And what Comcast has said as well, we had it before, but that's, it's, you know, as I put into my footnote, Comcast doesn't call a consumer, provide all the information and ask them to confirm it. They say, give us your information. And that information they got from Mr. Hearn in 2019 was what was used to do this credit poll. Did you, just to be clear, did you make these same allegations in your complaint or in district court filings, or did they first emerge in appellate briefing? They first emerged by Comcast in appellate briefing. So we had to address it there. The fact that they had this information before, as opposed to what was provided by phone. That's why I put into my footnote that Comcast is shifting the story on appeal. With that being said, well, I think my time is up. I think we have your argument, Mr. Zamo. We'll hear a rebuttal from Mr. Shaw. Thank you, your honor. A few points, just to correct that last point, Judge Grant, in response to your question, Comcast did not raise it for the first time on appeal. It's in the declaration supporting the motion to compel arbitration. This is at document 18-1, paragraph five. It's cited in our appeal reply brief, which clearly lays out all of the record evidence in the district court. Comcast at paragraph five and six of that declaration, which was never rebutted by plaintiff until his reply brief argument, not in any of the evidence in the record, not in Mr. Hearn's declaration. But here's what paragraph five and six say. Comcast business records reflect that plaintiff placed a call on March 5th about reconnecting Comcast services that his Mableton address. During that call, a Comcast customer service representative verified plaintiff's personal information on file for the Mableton account and confirmed he was seeking to reconnect services at the Mableton address. Following verification of plaintiff's personal information, the CSR used the information in Comcast business records in connection with the Mableton account, including his social security number to initiate a credit inquiry. So this was not raised for the first time on appeal by Comcast. This is in the district court. It's in the record. It was undisputed by the other side's declarations. And in their complaint, they even admit that plaintiff Comcast never even requested the plaintiff's social security number to run the pool. Now, aside from that record factual point, which is crystal clear in the record that Comcast had the information before and based on that information, ran the credit pool that is the subject of his FCRA claim. Beyond that, let me address a few of the legal points here. My colleague on the other side argues that it's a question of the intent of the parties, but under Georgia law, the best indication of the intent of the parties is the text of the contract. And here the text of the contract is unambiguous. It says you shall arbitrate any dispute. And then counsel for plaintiff argues, well, it wasn't clear that it would extend to disputes that arise after termination. But here's the second sentence of the arbitration provision in section 13. This is section 13B on page 15 of the arbitration agreement. It says this arbitration provision shall be broadly interpreted. Dispute means any claim or controversy related to Comcast, including but not limited to, and this is clause three, claims that arise after the expiration or termination of this agreement. It could not be clearer. It says it shall apply to claims that arise after the expiration or termination of this agreement. So counsel on the other side is simply wrong to say that the agreement was silent on post termination claims. It's there in black and white. The last point I'll make, your honor, is Judge Grant, you are right about the Doe decision. The critical difference is the agreement in Doe said relating not just any dispute, as counsel on the other side said, it said any dispute arising out of or relating to the employment crew agreement. And what this court critically said is if the parties had simply put a period after any dispute as the Comcast agreement does, well then of course all of these claims would be arbitrable. And so that, your honor, I think is a critical point. If there are no further questions. Well, I just have one question. This may not necessarily be relevant. Does Comcast conduct a credit check for all subscribers? Yes, your honor, at the time of before they can be approved to be a customer, then they run the credit check at that point. And there's a process by which they inform the customer and all of those things, but yes, your honor. And whenever you run a credit check, that damages your credit score? Your honor, I can't speak to that. That's beyond the record. I'm not sure about that. But I should add just in my response to your question, there is an alternative mechanism rather than running a credit check. A customer can post a bond or like a large deposit in lieu of running the credit check. So just to be fully clear. All right. Well, that concludes our arguments for this morning. This court will be in recess until nine o'clock tomorrow morning. Court is in recess.